# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **DONNETTA BLOW,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-12-S-3657-NE** |
| | ) | |
| **VIRGINIA COLLEGE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Donnetta Blow, asserts claims against Virginia College, her former employer, for: race discrimination pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*; race discrimination pursuant to 42 U.S.C. § 1981; and retaliation.[1]  The case currently is before the court on defendant's motion for summary judgment.[2]  Upon consideration of the motion, briefs, and evidentiary submissions, the court concludes the motion should be granted.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact

---

[1] *See* doc. no. 11 (Amended Complaint).

[2] Doc. no. 22.

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In

other words, summary judgment is proper "after adequate time for discovery and

upon motion, against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"In making this determination, the court must review all evidence and make all

reasonable inferences in favor of the party opposing summary judgment." *Chapman*

*v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v.*

*City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-

moving party are not unqualified, however.  "[A]n inference is not reasonable if it is

only a guess or a possibility, for such an inference is not based on the evidence, but

is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d

1321, 1324 (11th Cir. 1983) (alteration supplied).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary
> judgment unless that factual dispute is *material* to an issue affecting the
> outcome of the case.  The relevant rules of substantive law dictate the
> materiality of a disputed fact.  A genuine issue of material fact does not
> exist unless there is sufficient evidence favoring the nonmoving party
> for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration

supplied).  *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)

(asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. SUMMARY OF FACTS

### A.    Background Information and Plaintiff's Employment History

Defendant, Virginia College, is a private higher education institution with campuses in several locations, including Huntsville, Alabama.[3]  Plaintiff, Donnetta Blow, began working for Virginia College as a receptionist in the Admissions Office at the Huntsville, Alabama campus on June 9, 2008.  She was promoted to the position of Admissions Associate I, with more than a fifty percent pay raise, on August 11, 2008.[4]  All Admissions Associates were "responsible for the recruitment and selection of qualified applicants for admission to programs of Virginia College and for appropriate follow-up to assure successful matriculation."[5]  There are three levels of Admissions Associates at Virginia College:  I, II, and III.  Admissions Associates begin working at Level I (as did plaintiff), and they are expected to advance to Level II by the time of their second annual performance evaluation.[6]

---

[3] Defendant's evidentiary submission, Exhibit C (Declaration of Dean Mahaffey) ¶ 2.

[4] Defendant's evidentiary submission, Exhibit A (Deposition of Donnetta Blow), at 145-46.

[5] Blow Deposition, Exhibit 11 (Education Corporation of America Admissions Compensation Plan), at 3.

[6] Mahaffey Declaration ¶ 7.

**B.    Evaluation Standards for Admissions Associates**

Admissions Associates are evaluated based on certain performance standards set forth in the Virginia College Compensation Plan and Job Description Summary ("Compensation Plan).[7]  The performance standards and job responsibilities increase for each Level of Admissions Associate.  For example, a Level I Admissions Associate is assigned an average of 18 "leads," or potential recruits, each week, while a Level II receives an average of 21 leads, and a Level III receives an average of 24. In addition to the leads assigned by the College, each Admissions Associate is expected to independently generate referrals for recruitment development.[8]

All Admissions Associates also are expected to convert a certain number of leads and referrals into applications, interviews, and enrollments, with the expectations increasing for each Level.  An Admissions Associate I is expected to generate 10 appointments, 6 interviews, 3 applications, and 3 referrals each week. She also is expected to generate 20 new student starts each quarter, with 25% of those starts coming from independent referrals.  Ninety percent of the students recruited by an Admissions Associate I are expected to remain enrolled after 30 days; 80% are expected to remain after 90 days, and 65% are expected to remain after 270 days.  An

---

[7] *Id.* ¶ 5.
[8] Blow Deposition, Exhibit 11, at 4.

Admissions Associate I is expected to convert 30% of her leads into interviews, 50% of her interviews into applications, 75% of her applications into enrollments, and 80% of her enrollments into "starts" (*i.e.,* students who actually start classes). Those numbers translate into an overall expectation that 8% of an Admission Associate I's initial leads ultimately will be converted to starts.[9]

The expectations for a Level II Admissions Associate are slightly higher. An Admissions Associate II is expected to generate 12 appointments, 8 interviews, 4 applications, and 4 referrals each week. She also is expected to generate 25 new student starts each quarter, with 25% of those starts coming from independent referrals. As with the Admissions Associate I, ninety percent of the students recruited by an Admissions Associate II are expected to remain enrolled after 30 days; 80% are expected to remain after 90 days, and 65% are expected to remain after 270 days. An Admissions Associate II is expected to convert 32% of her leads into interviews, 50% of her interviews into applications, 75% of her applications into enrollments, and 80% of her enrollments into starts. Those numbers translate into an overall expectation that 10% of an Admission Associate II's initial leads ultimately will be converted to starts.[10]

---

[9] *Id.* at 5.

[10] *Id.*

Admissions Associates are evaluated against those standards in a weekly

Report Card, the purpose of which is to

> review weekly performance with each Associate, have a standard form
> to communicate that activity, and formally record any remedial work
> that needs to be accomplished to get or remain on track. The Report
> Cards [also] measure pipeline activity and ensure that Associates are
> practicing effective stewardship of leads to achieve overall performance
> goals.[11]

The Report Cards are based purely on objective data generated by the College's

computerized record-keeping system.[12] The primary areas reviewed each week by

management are whether the employee met her weekly Referral and Application

Targets, and whether she received an overall weekly performance score of at least 85.

> Associates missing at least one of the measures each week must
> be monitored and coached to improve performance in the deficient area,
> and this should be noted on the Report Card. Associates failing to
> achieve two of the three measures in a week will earn a "strike." After
> three "strikes" in consecutive weeks, the Associate is automatically
> placed on a formal Performance Improvement Plan.[13]

In addition to the objective criteria graded on the Report Card, each Admissions

Associate is evaluated for "other qualitative issues germane to the Associate's overall

performance such as scheduling, attendance, judgment, code of conduct, and

---

[11] *Id.* at 6 (alteration supplied). *See also* Blow Deposition, at 261.

[12] Blow Deposition, Exhibit 11, at 6.

[13] *Id.* at 8.

professional behavior."[14]

The Compensation Plan states the following with regard to the imposition of

Performance Improvement Plans:

> The goal of the Performance Improvement Plan (PIP) is to ensure the Associate clearly understands the requirements for success in the role and what steps are required to raise performance to a satisfactory level.  In order to remain employed during the PIP, the Associate must demonstrate a reasonable performance improvement each week by meeting or exceeding targets in Referrals, Applications, and overall score . . . .

> An Associate who earns two additional "strikes" in the 30 Day PIP period may be terminated.  An Admissions Associate who meets or exceeds the Referral, Application, and Overall Score objectives for three consecutive weeks in the PIP period earns his/her way off the performance plan.  A PIP will last from 2-4 weeks depending on the performance of the Associate — it can lead to termination in as little as 2 weeks or lead to a return to "good-standing" employment status in three or four weeks.

> Unsatisfactory performance can result from other factors than Report Card measurements, and should be handled in the same fashion and time frame.  Examples include scheduling/attendance, professionalism, code of conduct, or other behavioral/judgment issues, irrespective of quantitative performance.  For whatever reason, whenever substandard performance indicates possible termination, the DOA [*i.e.,* Director of Admissions] must seek and obtain the advice and support of the campus president and HR.

> This PIP process will be implemented consistently in the ECA [*i.e.,* Education Corporation of America, the parent organization to Virginia College] Admissions organization.  A manager who fails to implement this consistently is subject to his/her own performance and

---

[14] *Id.*

disciplinary action.[15]

## C.    Assignment of Leads

Prospective student leads originate from a variety of sources.  "Paid leads" are generated when a prospective student clicks on a Virginia College link or logo on an Internet site and provides contact information that is forwarded to an Admissions Associate for follow-up.[16]  Leads also may be generated through the "CARS System," which connects interested telephone callers directly to available Admissions Associates.[17]  Finally, a lead may be generated when a "walk-in" student physically appears at the Admissions Office and expresses interest in attending the College.[18]

Distribution of leads among the various Admissions Associates is controlled by the receptionist, who creates a distribution list each week based on the previous week's performance chart reflecting each Associate's number of enrollments, applications, referrals, interviews, and appointments.  The receptionist ranks all of the Associates from highest to lowest, depending on their performance the previous week.[19]  The general practice was for the receptionist to distribute the leads in a

---

[15] *Id.* (alterations supplied).

[16] Blow Deposition, at 203-04.

[17] *Id.* at 207-08.  The record does not indicates what the acronym "CARS" stands for.

[18] *Id.* at 218.

[19] Defendant's evidentiary submission, Exhibit D (Declaration of Susan Poyer) ¶ 3; Mahaffey Declaration ¶ 9; Blow Deposition, at 218, 220-21, 231-32.

"round-robin" fashion, beginning with the Associate whose name was on top of the distribution list.  Once each Associate on the distribution list had received a lead, the receptionist would start again at the top of the list.  Receptionists were supposed to ensure that the distribution of leads was as balanced as possible each week.[20]  However, plaintiff testified that, in practice, the distribution of leads was not always equitable.  For example, if an Associate was away from the office or otherwise unavailable when the time came for a lead to be assigned to her, she would be skipped, and the receptionist would not always go back and assign leads to that Associate when she became available.  Additionally, even if an Associate was present, her name might not be placed on the list on any given day or week if the Director of Admissions thought she was underperforming.[21]  It is undisputed, though, that whenever the receptionist distributed leads, the only information she had was the name of the lead, except in limited circumstances where the lead was a possible duplicate of one already registered in the College's computer system.  The receptionist had no way of knowing whether any given lead was "good" or "bad," in the sense of the likelihood that it would lead to an enrollment.[22]

Generally, if a given lead had already been assigned to a particular Admissions

---

[20] Poyer Declaration ¶ 3.

[21] Blow Deposition, at 218-20.

[22] Poyer Declaration ¶ 5.

Associate, any subsequent calls or other inquires from that lead would be channeled to the same Associate, although if the previously assigned Associate was not available, any available Associate could talk to the lead in order to address immediate questions.[23]  Further, if a lead was generated that had been previously assigned to an Associate who no longer worked for Virginia College, or who had not been in contact with the lead during the last six months, that lead would be assigned to the next Associate on the distribution list.  Those leads generally are referred to as "reassigned leads."[24]

## D.   Plaintiff's 2010 Performance Evaluations

Angela Beck, a white female, became the Admissions Manager (also referred to as the Director of Admissions) and, therefore, plaintiff's direct supervisor, during June of 2010.[25]  On plaintiff's July 2010 performance review, Beck rated plaintiff's performance as "Outstanding," which was the second highest of five possible rating categories.[26]  Plaintiff disputed that rating, because a white male employee named Jeff Brown received the same rating, and his performance was not as good as hers. Plaintiff believed her performance should have been rated at the higher,

---

[23] Blow Deposition, at 210-11.

[24] *Id.* at 239-41.

[25] *Id.* at 149-51.

[26] *Id.* at 299-302; Blow Deposition, Exhibit 17, at 2.

"Exceptional" level, and the College elevated the rating to accommodate plaintiff's request.[27]   Angela Beck and Jim Foster, the President of the Huntsville campus, signed the document memorializing the elevation of plaintiff's rating.[28]  Even before plaintiff's rating was elevated from "Outstanding" to "Exceptional," her performance was good enough to warrant a promotion to Admissions Associate II.[29]  She received that promotion, and a raise of approximately $2,000, in July of 2010.[30]

Plaintiff received three consecutive strikes on her October 24, October 31, and November 7, 2010 performance evaluations as a result of her failure to meet the minimum standards of her position.  Those strikes were noted on the Report Card plaintiff received on November 17, 2010.[31]  Because of those three strikes, plaintiff received a Performance Improvement Plan ("PIP") on November 17, 2010.[32]  The PIP notified plaintiff that her performance was not at an acceptable level, and that she should work to attain at least the following minimum goals:

- Make a sufficient number of <u>daily</u> follow-up telephone calls to

---

[27] Blow Deposition, at 295-302, 305-06 and Exhibit 20.

[28] Blow Deposition, at Exhibit 20.

[29] Blow Deposition, at Exhibit 19 (July 16, 2010 Email from Dean Mahaffey to Donnetta Blow).

[30] Blow Deposition, at 146 and Exhibit 7 (Personnel Action Form), at ECF 63.  *See also* Mahaffey Declaration ¶ 3.

[31] Blow Deposition, at 313 and Exhibit 23 (November 17, 2010 Report Card).

[32] Blow Deposition, at 314 and Exhibit 24 (November 17, 2010 Warning Letter and Performance Improvement Plan).

prospective students to schedule a minimum average of 12 new appointments per week.

- Conduct a minimum average of 8 new interviews per week with prospective students.

- Secure a minimum weekly average of 4 new prospective students by way of referral from past, present, or future students.

- Secure a minimum weekly average of 4 new applications for admissions from prospective students.

- Recruit and start a minimum of 20 new students for the January 2010 start or a combined total of 25 starts for the entire 1st Quarter (includes the February mini).

- Maintain a lead/new start conversion rate of at least 10% while achieving the above minimum standards.[33]

Plaintiff was advised that she was ineligible to work overtime until her performance improved, and she was cautioned that, if "acceptable performance levels are not maintained, you may face continued disciplinary measures up to and including your immediate termination."[34]

Plaintiff received another strike on her November 22, 2010 Report Card, again for failure to meet the minimum standards of her position.[35]  She disputed that strike because she had been out sick during the relevant work period.[36]  Plaintiff did not

---

[33] Blow Deposition, Exhibit 24, at 1.

[34] *Id.* at 2.

[35] Blow Deposition, at 315-16 and Exhibit 25 (November 22, 2010 Report Card).

[36] Blow Deposition, at 315-16.

recall receiving any disciplinary action as a result of the November 22 strike,[37] and there is no indication in the record that she was disciplined.  There also is no evidence regarding whether the strike remained on plaintiff's record after she complained.

## E.     Plaintiff's 2011 Performance Evaluations and Termination

Plaintiff received strikes on her February 27, March 13, April 10, and April 24, 2011 Report Cards, due to her failure to meet the minimum standards of her position.[38]  She did not receive a PIP as a result of those strikes, however, because they did not occur in three consecutive weeks.

Plaintiff received her annual performance evaluation on May 19, 2011.[39]  The subjective portions of the review, concerning areas such as job knowledge, leadership, professionalism, ethics, and integrity, were completed by Beck, and they reflected almost the same high ratings as plaintiff had received on her revised performance review the previous year.[40]  The objective portion of the review, which measured such areas as referrals, retention, and effectiveness, was a different story, however, because plaintiff received much lower scores than she had the previous year.   In fact, plaintiff's overall objective performance in 2011 was rated as

---

[37] *Id.* at 319.

[38] Blow Deposition, at Exhibit 33 (May 25, 2011 Report Card).

[39] Blow Deposition, at 342-44 and Exhibit 29 (May 19, 2011 Annual Performance Review).

[40] *Compare* Blow Deposition, Exhibit 29 (May 19, 2011 Annual Performance Review) *with* Blow Deposition, Exhibit 20 (July 21, 2010 Annual Performance Review).

"Substandard."[41]

According to the Compensation Plan, a Substandard evaluation would result in the imposition of a Performance Improvement Plan, or, if the employee already was on a PIP, the Substandard evaluation could result in termination.[42]  Plaintiff was placed on a second Performance Improvement Plan on May 23, 2011.[43]  She was instructed that she needed to increase her lead-to-start ratio from 8% to 10%, and to increase her 90-day retention rate from 69% to 80%, in accordance with the requirements set forth in the Compensation Plan for her position.  She also was instructed that she needed to improve the consistency of her data entry and paperwork.[44]  She was cautioned as follows:

> These issues are serious and your failure to correct the areas of unacceptable performance as outlined in this plan while meeting all other minimum standards of performance will result in your immediate termination.  Also note, immediate termination of your employment will result should your improved performance fail to be sustained.[45]

Plaintiff next received strikes on her May 8 and May 15, 2011 Report Cards, due to her failure to meet the performance goals of her position.[46]  Her May 25, 2011

---

[41] Blow Deposition, Exhibit 29 (May 19, 2011 Annual Performance Review), at 1.

[42] Blow Deposition, Exhibit 11 (Compensation Plan), at 12.

[43] Blow Deposition, at 345-46 and Exhibit 30 (May 23, 2011 Performance Improvement Plan).

[44] Blow Deposition, Exhibit 30 (May 31, 2011 Performance Improvement Plan), at 2.

[45] *Id.*

[46] Blow Deposition, at Exhibit 33 (May 25, 2011 Report Card).

Report Card stated that she exhibited poor performance overall, and that all areas other than referrals required improvement.[47]  When plaintiff signed the May 25, 2011, report, she also wrote that she had questions about her lead count, because she believed some of her leads were "questionable."[48]  At Beck's request, plaintiff sent Beck an e-mail on May 26, 2011, explaining that, even though she had received twenty-two leads the previous week, only three of those were students with whom plaintiff could legitimately make contact, because six leads were referrals, and thirteen were "bad" leads.  Of the thirteen leads plaintiff considered to be "bad," two had disconnected telephone numbers, one had provided the wrong telephone number, two wanted online contact only, one came in after hours when plaintiff was at home, one came in so late in the afternoon that plaintiff did not have time to make contact the same day, one had previously been assigned to another Associate, four had been transferred by the CARS System to another associate, and one was deferred for two years.  Plaintiff believed that those "bad" leads should not be counted in the total lead count on which her performance reviews were based.[49]  Even so, she acknowledged during her deposition that she did not have any evidence that Ms. Beck intentionally

---

[47] *Id.*

[48] *Id.*

[49] Blow Deposition, at 247-48, 361, and Exhibit 12 (May 26, 2011 e-mail from Donnetta Blow to Angela Beck).

assigned her "bad" leads.[50]  In fact, she stated that she did not know how leads were assigned, and she agreed that it was "just sort of potluck whether you got a good lead or a bad lead."[51]  The only way to know whether a lead was more likely to turn out "bad" was if it was a "reassigned" lead, because those usually were older and did not result in as much success.[52]  Even so, plaintiff has not presented any documentation that she received more reassigned leads than other Admissions Associates.[53]

Plaintiff had a coaching meeting with Beck on May 26, 2011, to address her 2011 PIP and her lead assignments.[54]  During that meeting, plaintiff expressed concerns that Beck had been discriminating against her by giving her bad lead assignments.[55]  Despite the meeting, plaintiff received a third consecutive strike on her May 31 Report Card for the week ending May 22, 2011, for failure to meet minimum weekly performance standards.[56]  Beck sent an e-mail to Dean Mahaffey, Virginia College's Corporate Vice-President of Admissions, stating:

> Donnetta Blow has received a third strike in a row on her latest Report Card (see attached).  She is already on a PIP due to her "Substandard" rating on her yearly evaluation.

---

[50] Blow Deposition, at 259-60.

[51] *Id.* at 227-36.

[52] *Id.* at 246-47, 375.

[53] *Id.* at 372-76.

[54] *Id.* at 362-64 and Exhibit 34 (May 26, 2011 Memo).

[55] Blow Deposition, at 363-64.

[56] *Id.* at 378 and Exhibit 35 (May 31, 2011 Report Card).

What is the next step required of me?  Do I place her on another PIP?  If so, will you please send me the correct PIP format for this situation?[57]

Mahaffey responded, "I think we are at the point of a request for termination, unless Mitch [*i.e.,* Mitch Srail, the Regional Vice-President of Human Resources], says no."[58]  Plaintiff's employment was terminated on an unspecified date during June of 2011, in a meeting with Mitch Srail and Jim Foster.[59]

## F.   Comparators and Other Employees' Experiences

During her deposition, plaintiff could not identify any other individual — white or black — who received three consecutive strikes while already on a PIP, but whose employment was not terminated.[60]  Virginia College also is unaware of any such individual.[61]

Stacy Hall, a white female Admissions Associate, received strikes in three consecutive weeks on at least four occasions: April 11, 18, and 25, 2010; June 20, June 27, and July 4, 2010; October 3, 10, 17, and 24, 2010; and December 12, 19, and 26, 2010.[62]  Plaintiff asserts in her brief that Hall was not placed on a PIP on any of

---

[57] Mahaffey Declaration ¶ 13 and Exhibit A (May 31, 2011 e-mail from Angela Beck to Dean Mahaffey).

[58] *Id.* (May 31, 2011 e-mail from Dean Mahaffey to Angela Beck) (alteration supplied).

[59] Blow Deposition, at 24, 393.

[60] *Id.* at 283-86, 414-15.

[61] Mahaffey Declaration ¶ 16.

[62] *See* Plaintiff's Exhibit 7 (Stacy Hall July 19, 2010 Report Card); Plaintiff's Exhibit 8

those occasions, but the evidence she cites does not support that assertion.  The only evidence cited is Ms. Hall's Report Cards, which indicate that she received three or more strikes in a row on these occasions.  The July 19, 2010 Report Card states that a "PIP is forthcoming,"[63] and the January 15, 2011 Report Card indicates that the lower production numbers were due to the Christmas and New Years holidays, but there is no affirmative evidence to indicate, one way or another, whether Ms. Hall actually was placed on a PIP on *any* occasion.  The record does indicate, nevertheless, that Ms. Hall was reassigned to an entry-level Admissions Associate on April 21, 2011.[64]  The record does not contain any information regarding the significance of that reassignment.

Charles Garrett, a white male, received strikes in three consecutive weeks: April 17, April 24, and May 1, 2011.[65]  There is no date, no signature, and no comment on the copy of Mr. Garrett's Report Card plaintiff submitted as evidence. Further, there is no evidence to support plaintiff's assertion that Mr. Garrett was not placed on a PIP.  At some point prior to March 9, 2011, Mr. Garrett was reassigned

---

(Stacy Hall November 2, 2010 Report Card); Plaintiff's Exhibit 9 (Stacy Hall January 15, 2011 Report Card).

[63] Plaintiff's Exhibit 7.

[64] Plaintiff's Exhibit 12 (April 21, 2011 Personnel Action Form for Stacy Hall).

[65] Plaintiff's Exhibit 10 (Charles Garrett undated Report Card).

to an entry-level Admissions Associate.[66]   The record does not contain any information regarding the significance of that reassignment.

James Young, a white male, received strikes in three consecutive weeks:  June 27, July 4, and July 11, 2010.[67]  There is no date, no signature, and no comment on the copy of Mr. Young's Report Card plaintiff submitted as evidence.  Further, there is no evidence to support plaintiff's assertion that Mr. Young was not placed on a PIP.

Virginia College also terminated the employment of Regina Bolden, a black female Admissions Associate, on an unspecified date.  At the time of her termination, Ms. Bolden's direct supervisor was Angela Beck.[68]

## G.   Plaintiff's Complaints to Management

At some unspecified point during her employment with Virginia College, plaintiff reported that two white Admissions Associates named Stacy Hall and Hollie Tesigni had a practice of changing the assignments of leads that were generated by the CARS System.  Whenever Hall and Tesigni received a CARS call from a potential student who had previously made contact with another Admissions Associate, they

---

[66] Plaintiff's Exhibit 13 (March 9, 2011 Employee Contributions & Development Appraisal for Charles Garrett, indicating that his position was "Re-entry Admissions Associate.").

[67] Plaintiff's Exhibit 11 (James Young undated Report Card).

[68] Blow Deposition, at 404.

would make a change in the computer system to indicate that the lead was assigned to them instead.  Plaintiff stated during her deposition that she believed Hall and Tesigni only claimed leads previously assigned to black Admissions Associates, but she did ultimately acknowledge that she did not have any evidence to support that belief. When plaintiff reported that practice to Mr. Foster, he made a change to the computer system so that no Admissions Officer could alter the assignment of a lead.

Plaintiff sent an e-mail to Angela Beck, James Foster, and Mitch Srail on March 23, 2011, stating:

> I wanted to voice the general concern I still have about being singled out/treated different here at Virginia College. I know by sending this it may get me the label as "trouble maker," but it has been bothering me for a while and I think it is an issue that should be addressed not only for myself but for the company also.
>
> Last year I was told in a meeting with Mr. Foster and Angela, that if I am not on the clock I should not be working or at my desk.  Mitch met with us as a group and told us the same.  I understand and have no problems with that.  I am afraid for anyone to even ask me a question after I clock out.  The problem I have is that since we have been at this location there have been several incidents where admissions associates have come into enter information in to campus vue;[69] referrals, enrollments etc. on their off days.  One associate even came in on a Saturday to remove files.  I have been told that I can't ask my co-workers anything about their hours or what they are doing here.  I just feel as thought [*sic*] if I was told I can't work off the clock and everyone else was told the same, why is it okay for certain employee's [*sic*] to continually do so.  I have been really hesitant to say anything to anyone

---

[69] The court deduces from the record that Campus Vue is Virginia College's internal computer operating system.

because Angela has already told me that she feels as though she has to walk on eggshells around me.  Therefore when I do have a problem I have no one to discuss it with.

The reason I am bring[ing] this up now is because it happened again on last  Friday, one of the admission associates came in to turn in an enrollment on her day off.  If anything has changed please update me, therefore I will not feel as though the rules of the company are only directed to certain people.

Again, I apologize for sending the email and I hope I won't be reprimanded for it.[70]

Plaintiff sent another e-mail to James Foster, Angela Beck, and Hollie Tersigni

on May 12, 2011, stating:

I just wanted to explain the reason why I requested to record the conversation I was going to have with Angel and Hollie.  Earlier this week when Angela and Hollie called me into her office to review my report card, I could not see all of the information on the piece of paper. When I started to ask what something was on the paper because I couldn't see it, Angela took the defensive with me right away.  I then explained to her that I couldn't see what was on the paper because I have on new contacts.  Hollie confirmed it by saying they had been teasing me all day about the blinking.  The majority of the time I speak with Angela it seems to me that she is always on the defensive.  When discussing how she treats me she always says that she is not defensive with me; and it is me that is the "insubordinate."  Just to protect myself, I  stated  that  our  conversation  would  be  recorded.   I  really  feel uncomfortable meeting with Angela, I know it is part of the job so I limit my conversation as much as possible with her.  For some reason she is always angry with me.  That is the reason why I went in, signed my report card and didn't have any questions and didn't make any statements  because  whatever  I  may  say,  for  some  reason  is misinterpreted by Angela and reported.

---

[70] Blow Deposition, at Exhibit 31 (March 23, 2011 email) (alterations supplied).

Regarding the picture, I mention[ed] last night that I didn't look well do [*sic*] to the fact that I have been wearing new contacts and they keep my eyes swollen and I just don't feel picture pretty. I also feel extremely bad today from lack of sleep. It didn't say the picture was mandatory and I did not want to look less than my best. I would always like for my true beauty to show through when I take photographs.[71]

Lately, it appears that no matter what I do, try to do or say I am constantly brought into "the office." I would love to be able to come to work and do what I love and what I was hired to do and that's to enroll students. Over the weekend I gave a lot of thought to my working conditions here at VC. I realized that I am the same person I was when I started, I asked questions when I was not sure or felt that there was a problem. I made suggestions and I always helped anyone that needed a hand. I didn't have any problems with management or employee's [*sic*], students, etc. Now, it seem[s] like any question that I ask, is treated as if I am attempting to start a war. I tried to explained [*sic*] that this is the way I was raised, to ask questions and I have always worked in an environment that encouraged questions from employees without retaliation. Even in the handbook it says that: "every employee has the responsibility to ask question[s], seek guidance and report suspected violations to the code of conduct." I love what I do but lately it seems as though I am so busy trying to defend myself to truly benefit from being able to help the students. At this point I am not sure who I can talk to about anything, but I would love to come and be able to do what I love to do. I love what I do and I believe the majority of the people I speak with have no issues with me.

I would like for someone to please, please tell me what I am doing wrong, this constant pick, pick, pick, and slandering of my name is making this a hostile and stressful work environment.

Again I like always apologize for any problems.[72]

---

[71] Plaintiff is referring here to her refusal to participate in a group photograph of the employees in the Admissions Department. Plaintiff also stated in her deposition that she did not want to participate in the picture because her hair wasn't done. Blow Deposition, at 331-32.

[72] Plaintiff's Exhibit 15 (May 12, 2011 e-mail) (alterations supplied).

Plaintiff also had an in-person meeting with Beck and Foster to discuss why she had wanted to record her conversation with Beck.[73]  The record is not entirely clear about the date on which that meeting occurred, but presumably it was close to May 12, 2011, the date of plaintiff's e-mail.  Plaintiff also met separately with Foster that same day to inform him that she believed Beck had been treating her negatively because she was black.[74]

### III. DISCUSSION

**A.     Race Discrimination Pursuant to Title VII and 42 U.S.C. § 1981**

Plaintiff contends that her termination was the result of unlawful race discrimination.  She does not claim to have direct evidence of a race-based discriminatory animus, however.  Therefore, she must prove her claims with circumstantial evidence, navigating the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 (1981).  Under this analysis, a plaintiff must first establish a *prima facie* case of disparate treatment, which creates a presumption of discrimination.  To rebut the presumption, the employer then must articulate a legitimate, nondiscriminatory reason for the disputed employment action.

---

[73] Blow Deposition, at 334-35.

[74] *Id.*

If the employer does so, the presumption of discrimination drops from the case, and the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely a pretext for unlawful discrimination. *See McDonnell Douglas,* 411 U.S. at 802-05; *Burdine,* 450 U.S. at 252-56.

To establish a *prima facie* case of race-based discrimination in the termination of employment, plaintiff must show that (1) she is a member of a protected class, (2) her employment was terminated, (3) the employer treated similarly situated employees outside of her protected class more favorably, and (4) she was qualified to perform the duties of her job. *See, e.g., Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002); *Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001).[75]   Only the third element — whether a similarly situated employee outside plaintiff's protected class was treated more favorably — is in dispute here.[76]

---

[75] The elements for a claim of discrimination are the same under both Title VII and § 1981. *See Bass v. Board of County Commissioners,* 256 F.3d 1095, 1109 n.4 (11th Cir. 2001) (quoting *Rice-Lamar v. City of Fort Lauderdale,* 232 F.3d 836, 843 n.11 (11th Cir. 2000) ("The elements of a claim of race discrimination under 42 U.S.C. § 1981 are also the same as a Title VII disparate treatment claim in the employment context.").

[76] Plaintiff, who is African-American, clearly is a member of a class of persons protected by both Title VII and § 1981.  Further, the termination of plaintiff's employment unquestionably was an adverse employment action.  *See Llampallas v. Mini-Circuits Lab, Inc.*, 163 F.3d 1236, 1246 n.18 (11th Cir. 1998) (stating that termination is the "classic and ultimate 'tangible employment action'"). Finally, construing the facts in the light most favorable to plaintiff, she was qualified to perform the duties of her job.  In termination cases — as contrasted to cases involving an employer's failure to hire or promote — the question of whether a plaintiff was qualified to perform the duties of her job often is not an issue.  *See Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001).  The

The following is a concise summary of the Eleventh Circuit's guidance on what is required to show that two employees are similarly situated:

> "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 (11th Cir.), *opinion modified by* 151 F.3d 1321 (1998) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)). "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." *Id.* (internal quotations and citations omitted). *We require that the quantity and quality of the comparator's misconduct be nearly identical* to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges. *See Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.").

*Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999) (emphasis supplied).

Thus, plaintiff must show that employees outside her protected class (*i.e.,* non-African-Americans) were found guilty of the same or "nearly identical" misconduct, yet were disciplined in different ways. *Id.* "Absent some other similarly situated but differently disciplined worker, there can be no disparate treatment." *Abel v. Dubberly,* 210 F.3d 1334, 1339 (11th Cir. 2000).

---

Eleventh Circuit has recognized that, "in cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a prima facie case can be inferred." *Rosenfield v. Wellington Leisure Products, Inc.*, 827 F.2d 1493, 1495 n.2 (11th Cir. 1987); *see also Pace v. Southern Railway System*, 701 F.2d 1383, 1386 n.7 (11th Cir. 1983). Here, due to plaintiff's employment history with defendant, her qualification for her position can be inferred.

Where there are clear differences in either the *quantity* or *quality* of the acts of misconduct committed by the plaintiff and her alleged comparators, it cannot be said that they are "nearly identical."  *See Silvera v. Orange County School Board*, 244 F.3d 1253, 1259 (11th Cir. 2001) ("[A]lthough Silvera and Ritter have in common the fact that they were arrested in the 1970's . . . Silvera has three additional arrests . . . . The fact that Silvera had multiple arrests is by itself sufficient to establish that he is not similarly situated to Ritter.") (alteration supplied); *Maniccia*, 171 F.3d at 1368-69 (holding that a female plaintiff in a Title VII sex discrimination case was not similarly situated to male employees who each committed a single policy violation, whereas the female plaintiff had committed at least four policy violations); *Jones*, 137 F.3d at 1312-13 (holding that employees who allegedly committed one act of misconduct were not similarly situated to the plaintiff, who engaged in multiple acts of misconduct in the same day).

Here, plaintiff has failed to present any evidence of a similarly situated, non-African-American comparator who was treated more favorably.  In fact, she has not identified *anyone* who is similarly situated to her.  Plaintiff was terminated for receiving "strikes" on her Report Cards in three consecutive weeks while she was already under a PIP for underperformance.  There is no evidence of any other employee of any race who received three consecutive strikes on her Report Card

while already under a PIP.

Plaintiff's attempts to identify similarly situated comparators all fail. First, she asserts that Stacy Hall, Charles Garrett, and James Young, all of whom are white, received three consecutive strikes, but were not placed on a PIP. Even if that were true, it would not make those individuals similarly situated comparators. Plaintiff is complaining of discrimination in her *termination*, not in being placed on a PIP. Even more importantly, there is no actual evidence that Hall, Garrett, and Young did not receive PIPs. Plaintiff presented only those individuals' Report Cards, which reflect that they received consecutive strikes, but not whether they received a PIP. Plaintiff's conclusory statement that those individuals did not receive PIPs is insufficient. Second, plaintiff asserts that she and Regina Bolden "were the only two African-American associates terminated by Angela Beck while other Caucasian associates were not terminated for performance."[77]   It is irrelevant how many black and how many white associates were terminated, as long as no similarly situated white associates were retained despite their performance deficiencies. Third, plaintiff asserts that Stacy Hall and Charles Garrett "were afforded the opportunity to be reassigned in March and April 2011 while not disciplined in the same or similar

---

[77] Doc. no. 27 (Plaintiff's Summary Judgment Response Brief), at 11.

manner as Blow in June 2011."[78]  That factual statement is supported by the record, but it is irrelevant, as there is no evidence that either Hall or Garrett had the same performance problems as plaintiff.

In summary, because plaintiff has failed to identify a similarly situated, non-African-American employee who was treated more favorably than her, she cannot establish a *prima facie* case of race discrimination in the termination of her employment.  Accordingly, summary judgment is due to be granted on plaintiff's race discrimination claim.

## B.   Retaliation

"Retaliation is a separate violation of Title VII [and § 1981]."  *Gupta v. Florida Board of Regents,* 212 F.3d 571, 586 (11th Cir. 2000) (alteration supplied).   A plaintiff generally must prove three elements to establish a *prima facie* case of retaliation:  (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was a causal linkage between the protected conduct and the adverse employment action.   *See, e.g., Shannon v. BellSouth Telecommunications, Inc.,* 292 F.3d 712, 715 (11th Cir. 2002).

> Once plaintiff establishes a prima facie case [of retaliation] by proving only that the protected activity and the negative employment action are not completely unrelated, the burden shifts to the defendant to proffer a legitimate reason for the adverse action . . . .  The burden

---

[78] *Id.*

then shifts back to the plaintiff to prove by a preponderance of the evidence that the "legitimate" reason is merely pretext for prohibited, retaliatory conduct.

*Sierminski v. Transouth Financial Corporation*, 216 F.3d 945, 950 (11th Cir. 2000) (citations omitted).

Even assuming plaintiff can establish a *prima facie* case that her termination was the result of unlawful retaliation, she cannot demonstrate that defendant's proffered legitimate, non-retaliatory reasons for the termination decision are pretextual. Defendant states that it terminated plaintiff's employment "because she repeatedly failed to meet the minimum performance requirements for her position. While already on her second PIP, Plaintiff earned a third consecutive strike for not meeting performance goals."[79] That is a legitimate, non-retaliatory reason for the termination decision.

Thus, plaintiff can survive summary judgment on her retaliation claim only if she comes "forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *Burdine*, 450 U.S. at 256; *McDonnell Douglas,* 411 U.S. at

---

[79] Doc. no. 23 (Defendant's Summary Judgment Brief), at 24.

804).  Plaintiff's burden at this step of the analysis is that of "cast[ing] sufficient doubt on the defendants' proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct . . . .'"  *Combs*, 106 F.3d at 1538 (quoting *Cooper-Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994)) (alteration supplied); *see also Chapman*, 229 F.3d at 1024-25.  Plaintiff shoulders that burden by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont de Nemours & Company*, 100 F.3d 1061, 1072 (3d Cir. 1996)) (internal quotation marks omitted).  Additionally, a plaintiff must produce "sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of *each* of the employer's proffered reasons for its challenged action."  *Combs,* 106 F.3d at 1529 (emphasis supplied).

Plaintiff asserts that the following demonstrate pretext:  (1) the fact that Stacy Hall, Charles Garrett, and James Young (all of whom are white) received at least three consecutive strikes but were not placed on a PIP, and (2) the fact that Stacy Hall and Charles Garrett were reassigned instead of terminated.  Third, she states: "Finally, Plaintiff has presented evidence which challenged her supervisor and

complained about the manner in which leads were distributed and clearly expressing her concerns over discrimination and being 'singled out' while labeled a 'troublemaker.' . . . . Defendant, themselves, failed to follow their own policy within the compensation plan."[80]

As an initial matter, the court once again notes that plaintiff has not produced any evidence that defendant failed to place Hall, Garrett, and Young on PIPs after they received three strikes. Even if she had produced such evidence, however, it would not call into question defendant's proffered reason for terminating plaintiff's employment. Defendant did not terminate plaintiff's employment for receiving three strikes and being placed on a PIP; it terminated her for receiving three consecutive strikes *while already on a PIP*. Similarly, defendant's reassignment of Hall and Garrett also does not call into question defendant's proffered legitimate, non-discriminatory reason. It is irrelevant whether Hall and Garrett received more favorable treatment than plaintiff, because they did not have the same disciplinary background as plaintiff. As for plaintiff's third pretext argument, it is difficult to decipher. To the extent plaintiff is arguing that defendant essentially caused her performance problems by intentionally assigning her "bad" leads that could not be converted into enrollments, there is no evidence to support that argument. Instead,

---

[80] Doc. no. 27 (Plaintiff's Summary Judgment Response Brief), at 14.

the evidence indicates that there was no way of knowing, when a lead was assigned to an Admissions Associate, whether the lead was likely to be converted into an enrollment.  Further, plaintiff has not made any argument that defendant failed to assign her *enough* leads.  To the extent plaintiff is arguing that defendant failed to follow its own policies, there is no evidence to support that argument either.  To the contrary, plaintiff's termination for poor performance while on a PIP is in accordance with the Compensation Plan, and there is no evidence that defendant violated any other policies.

In summary, because plaintiff has failed to demonstrate that defendant's proffered legitimate, non-retaliatory reasons actually are a mere pretext for retaliation, summary judgment is due to be granted on plaintiff's retaliation claim.

### IV. CONCLUSION AND ORDERS

In accordance with the foregoing, defendant's motion for summary judgment is GRANTED, and all of plaintiff's claims are DISMISSED with prejudice.  Costs are taxed to plaintiff.  The Clerk is directed to close this file.

DONE this 14th day of August, 2014.

_____
United States District Judge